UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                           Case No. 2:22-cr-222(4)
     v.                      JUDGE EDMUND A. SARGUS, JR.

ABUBAKARR SAVAGE,

      Defendant.

## OPINION AND ORDER

This matter is before the Court on Abubakarr Savage's Motion for a Judgment of Acquittal. (ECF No. 279.) For the reasons stated in this Opinion and Order, the Motion is **DENIED**.

## BACKGROUND

On August 19, 2024, a jury found Mr. Savage guilty of one count of conspiracy to distribute marijuana in violation of 21 U.S.C. § 846. (ECF No. 248, PageID 1545.) The jury determined that 1,000 kilograms or more of marijuana were attributable to Mr. Savage because of his own conduct and the conduct of other co-conspirators reasonably foreseeable to him. (*Id.* PageID 1546.)

Mr. Savage now challenges the sufficiency of the evidence supporting his conviction and moves for a judgment of acquittal. (ECF No. 279.) He argues that the evidence does not support the jury's finding that he intended to join a conspiracy to distribute marijuana and he challenges the amount or marijuana attributed to him. (*Id.*) The Government opposes the Motion (ECF No. 282), and Mr. Savage replied (ECF No. 283).

### I.     Procedural Background

The Government brought this case against individuals alleged to be members of a drug trafficking organization known as the Third World Mob. In December 2023, Mr. Savage, Kflegewerges Abate, and Teddy Asefa, were charged under the Second Superseding Indictment

with several counts related to their role in the alleged conspiracy to illegally traffic marijuana. (ECF No. 97.) Thomas Asefa was also charged in the Second Superseding Indictment, but the Government did not accuse him of being a member of the Third World Mob or participating in the conspiracy to traffic marijuana. (ECF No. 97.)

Mr. Savage, Mr. Abate, and Teddy Asefa were charged under Count 1 with conspiracy to distributed controlled substances in violation of 21 U.S.C. §§ 841 and 846. (*Id.* PageID 404.) Mr. Abate was also charged with possession with intent to distribute 100 kilograms or more of marijuana, in violation of 21 U.S.C. § 841, possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i), possession of a firearm by a prohibited person in violation of 18 U.S.C. § 922(g)(1), possession of ammunition by a prohibited person, in violation of 18 U.S.C. § 922(g)(1), and wire fraud in violation of 18 U.S.C. § 1343. (*Id.* PageID 411–17.) The Government also charged Teddy Asefa with wire fraud in violation of 18 U.S.C. § 1343 (*id.* PageID 418–20), and his brother, Thomas Asefa, with obstruction of justice in violation of 18 U.S.C. § 1512(c)(2). (*Id.* Page ID 412–13.)

A few days before trial, Teddy Asefa pleaded guilty to conspiracy to distribute 1,000 kilograms or more of marijuana in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(vii), and 846, and wire fraud in violation of 18 U.S.C. § 1343. (ECF Nos. 228, 231.) The case proceeded to trial against Mr. Savage, Mr. Abate, and Thomas Asefa on August 7, 2024. (ECF No. 233.)

## II.    Evidence Introduced by the Government at Trial

At trial, the Government put forth evidence that members of the Third World Mob, including Mr. Savage, engaged in a conspiracy to distribute marijuana between August 2013 and November 2022. (Opp., ECF No. 282, PageID 3655.) The Government introduced evidence of seven "events"—searches and traffic stops—where marijuana or its cash equivalent was seized. (*Id.*) In total, the seven events yielded 1,144 kilograms of marijuana or its cash equivalent

attributable to the conspiracy, says the Government. (*Id.* PageID 3660.) Mr. Savage protests that the Government has not introduced sufficient evidence of his connection to the conspiracy, or his responsibility for the marijuana seized by law enforcement to sustain a conviction against him. (*See* Mot., ECF No. 279.)

### A. Law enforcement seized 61 kilograms of marijuana in Tucson, Arizona in August 2013.

The first event relevant to the conspiracy occurred on August 21, 2013 in Tucson, Arizona. On that day, law enforcement seized approximately 95 pounds—or 43 kilograms—of marijuana after executing a search warrant on a hotel room where Mr. Abate, Teddy Asefa, and another alleged member of the Third World Mob, Fentahun Mengistu, were purportedly staying. (Trial Tr. 213:22–24, 215:08–222:25, ECF No. 271, PageID 1948–58.) At trial, Detective Josh Cheek testified that he executed a search warrant on the hotel room, and searched Mr. Abate's, Mr. Asefa's, and Mr. Mengistu's persons. (*Id.* 216:22–25, PageID 1951.) He explained that law enforcement collected $80,000 in cash from all three individuals and 95 pounds of marijuana from the hotel room. (*Id.*) Using a formula that the Defendants did not object to at trial, Detective Cheek converted the $80,000 in cash to its equivalent number of kilograms and added that amount to the 95 pounds of marijuana found in the hotel. (Opp., PageID 3559.) In total, the Tucson searched amounted to 61 kilograms of marijuana attributable to the conspiracy. (*Id.*) The Government asserts that the large volume of cash and marijuana, coupled with "masking agents, and multiple cell phones" were "indicators of large-scale drug trafficking." (*Id.* PageID 3660.)

### B. Law enforcement seized $940,000 in cash from Mr. Abate's residence in August 2019.

Six years passed before the next event relevant to the conspiracy occurred, says the Government. Diyonee Capers, Mr. Abate's girlfriend, testified that he moved into 1357 Phlox Avenue in Columbus, Ohio with her in the spring of 2017. (Trial Tr. 1689:08–22, ECF No. 276,

3

PageID 3424.) They lived there until 2019. (*Id.*) In August 2019, the landlord Raymond Smith received complaints from neighbors that the smoke alarm at Phlox was chirping. (Trial Tr. 260:21–24, ECF No. 271, PageID 1995.) When he inspected the property, he found that the tenant appeared to have moved out, but the house smelled like marijuana. (*Id.* 261:21–262:14, PageID 1996–97.) So he called the police and consented to a search of the property. (*Id.*) Detective Aaron Kawasaki and Special Agent Chris Caplin testified that during the search, they discovered marijuana residue near the kitchen sink (*id.* 250:19–20, PageID 1985), and approximately $940,000 in cash vacuum-sealed inside a suitcase (*id.* 275:12–22, PageID 2010). According to the Government, that amount of cash is equivalent to 213 kilograms of marijuana. (Opp., PageID 3659.) Combining the 213 kilograms with the 61 kilograms collected from the Tucson search, the Governments calculates that by 2019, it put forth evidence that 274 kilograms of marijuana were attributable to the conspiracy. (*See id.*)

### C. Law enforcement seized 11 kilograms of marijuana from a traffic stop of Brandon Moore in July 2021.

Two years later, law enforcement conducted a traffic stop of Brandon Moore after he left a residence located at 2768 Acarie Drive. At trial, Mr. Moore testified about that traffic stop. He explained that he ran into Mr. Abate at a gas station and had a discussion with him about dealing drugs. (Trial Tr. 423:13–25, ECF No. 272, PageID 2158.) He was directed to a set of apartments at Acarie Drive to purchase marijuana on July 26, 2021. (*Id.* 424:10–25, PageID 2159.) Mr. Moore testified that a "dark-skinned gentleman" whom he did not know opened the door for him. (*Id.* 426:25–427:03, PageID 2162.) Sergeant Jake Smith, who was conducting surveillance on the apartment that day, testified that Abubakarr Savage was the person who opened the door for Mr. Moore. (Trial Tr. 1282:03–1291:03, ECF No. 275, PageID 3016–26.) Mr. Moore then obtained roughly 25 pounds of marijuana—or 11 kilograms—and left the apartment. (Trial Tr. 428:08–21,

ECF No. 272, PageID 2163.) Soon after he left, law enforcement conducted a traffic stop on Mr. Moore and seized the 11 kilograms of marijuana. (*Id.*)

### D. Law enforcement seized 3 kilograms of marijuana in a search of 1407 Chambers Road in August 2021.

A few weeks later, on August 4, 2021, law enforcement executed a search warrant on 1407 Chambers Road and seized 3 kilograms of marijuana. Bryan Mason, a Columbus Police Officer serving on a Drug Enforcement Agency task force in 2021, testified that he participated in the search on Chambers Road. (Trial Tr. 574:21–588:18, ECF No. 272, PageID 2309–23.) Law enforcement had traced Menelik Solomon, another alleged member of the conspiracy, to the Chambers Road address. (Trial Tr. 1298:13–22, ECF No. 275, PageID 3033 (testimony of Sergeant Jake Smith).) Officer Mason explained that three kilograms of marijuana were seized from this address along with a Delta Airlines' passenger luggage receipt with Abubakarr Savage's name on it. (Trial Tr. 585:08–10, ECF No. 272, PageID 2320.) At this point, the Government attributed 288 kilograms of marijuana to the conspiracy. (*See* Opp., PageID 3659–60.)

### E. Law enforcement seized 20 kilograms of marijuana from 3634 Royal Crescent in November 2021.

Next, law enforcement seized 20 kilograms of marijuana from an apartment located at 3634 Royal Crescent. Earlier that day, on November 9, 2021, Robert Vass, a Columbus Police Officer, testified that Mr. Abate and Teddy Asefa[1] were seen exiting from an area near the apartment at Royal Crescent and were subject to a traffic stop. (Trial Tr. 523:19–525:03, ECF No. 272, PageID 2258–60.) Later that same day, while Officer Jon Baer was conducting surveillance around the Royal Crescent address, he photographed two individuals. (*Id.* 509:18–514:18, PageID 2244–49.)

---

[1] Officer Vass testified that a "Sammy Asefa" was in the backseat when he conducted the traffic stop. (Trial Tr. 524:23–535:03, ECF No. 272, PageID 2259–60.) Sergeant Smith testified that this was Teddy Asefa. (Trial Tr. 1305:09–1306:21, ECF No. 275, PageID 3040–41.)

Sergeant Smith testified that the individuals in the photographs were Teddy Asefa and Abubakarr Savage. (Trial Tr. 1305:09–1306:21, ECF No. 275, PageID 3040–41.)

Shortly after Mr. Savage was seen leaving Royal Crescent, the apartment was subject to a search. Detective Sontino Williams testified that law enforcement found "baggies of marijuana," re-packaging materials, firearms, and ammunition. (Trial Tr. 532:21–560:16, ECF No. 272, PageID 2267–95.) In total, law enforcement seized 45 pounds—or 20 kilograms—of marijuana from the Royal Crescent address. (*Id.* 562:05–12, PageID 2297.) The total kilograms of marijuana attributable to the conspiracy at that point was 308, says the Government. (*See* Opp.)

### F. Law enforcement obtained a ledger with $600,000—or 136 kilograms— in drug transactions from Menelik Solomon's phone in March 2022.

Six months later, on March 15, 2022, Officer Eric Frost with the Whitehall Police Department initiated a traffic stop on a vehicle driven by Menelik Solomon. (Trial Tr. 641:21– 669:09, ECF No. 272, PageID 2376–2404.) A search of Mr. Solomon's person revealed $700 in cash and seven cellphones. (*Id.* 644:05–13, PageID 2379.) Officer Frost then searched Mr. Solomon's vehicle, and found several firearms, a vacuum sealer, packaging materials, and more cellphones. (*Id.* 644:24–645:24, PageID 2379–80.) On one of the phones, law enforcement found messages with "drug terms and numeric values associated with one another." (Trial Tr. 1357:13– 1359:04, ECF No. 275, PageID 3092–94.) Testimony at trial explained that the messages were an accounting ledger of drug transactions. (*Id.*) The phones, in total, documented more than $600,000 worth of drug transactions. (*Id.* 1359:10–11, PageID 3094.) According to the Government, the ledgers represented the sale of more than 136 kilograms of marijuana. (Opp., PageID 3663.) By March 2022, the Government contends that 444 kilograms of marijuana seized by law enforcement were attributable to the conspiracy. (*Id.*)

### G. Mr. Savage was arrested after a traffic stop on August 4, 2022.

On August 4, 2022, Mr. Savage was subject to a traffic stop. (Trial Tr. 1190:21–1206:25, ECF No. 275, PageID 2925–41.) Officer Chris Davis testified that Mr. Savage ran a stop sign and was pulled over. (*Id.* 1191:18–24, PageID 2926.) The officers smelled and saw marijuana in the vehicle, so they asked him to exit the vehicle. (*Id.* 1192:13–17, PageID 2927 (explaining that he saw specs of marijuana in the passenger seat).) A search of the vehicle revealed hundreds of dollars in cash, a firearm, five cell phones, and ski masks. (*Id.* 1199:01–1201:12, PageID 2934–36.) Mr. Savage was taken into custody and has remained incarcerated since. (ECF No. 217.)

### H. Law enforcement seized 700 kilograms of marijuana in a search of 8178 Chapel Stone in November 2022.

The final event relevant to the conspiracy occurred six months later on November 1, 2022. Surveillance of Menelik Solomon led police to 8178 Chapel Stone Road, in Blacklick, Ohio. (Trial Tr. 1473:19–1475:25, ECF No. 276, PageID 3208–10.) Weeks of surveillance led Sergeant Jake Smith to believe that the Chapel Stone address was a "stash house." (*Id.* 1475:20–25, PageID 3210.) Then on November 1, 2022, while reviewing surveillance footage, Sergeant Smith saw a U-Haul arrive at Chapel Stone and individuals unloading boxes into the garage from the U-Haul. (*Id.* 1476:02–18, PageID 3211.) He then obtained and executed a search warrant on the residence. Mr. Solomon, Teddy Asefa, and Mr. Abate were present at the residence during the search. (*Id.* 1477:04–23, PageID 3212.) Law enforcement seized over 1,500 pounds—or 700 kilograms—of marijuana in large, vacuum-sealed trash bags. (*Id.* 1478:01–05, PageID 3213; *see also* Trial Tr. 77:17–112:25, ECF No. 270, PageID 1812–47 (testimony of Detective Daniel Thomas).)

From the search of the hotel room in Tucson in 2013, to the final search at Chapel Stone in 2022, the Government asserts the conspiracy spanned 3,359 days and was responsible for at least 1,144 kilograms in drug transactions. (Opp., PageID 3660.)

7

I.       **Nebiyu Wassihun and Malik Curry testified that they dealt drugs for the Third World Mob.**

Two other witnesses testified that they personally dealt drugs with and for the Third World Mob—Malik Curry and Nebiyu Wassihun. Mr. Wassihun testified that Mr. Abate, Teddy Asefa, Fentahun Mengistu, and Amanial Andemariam were members of the Third World Mob, and the Third World Mob was a group of East African drug dealers based in Columbus Ohio. (Trial Tr. 1676:05–1680:05, ECF No. 276, PageID 3411–15; *see also* Trial Tr. 950:15–954:20, ECF No. 274, PageID 2685–89.) Mr. Wassihun purchased drugs from the Third World Mob starting in 2018 (Trial Tr. 957:05–16, ECF No. 274, PageID 269), and testified that the Third World Mob was getting about 500 pounds—or 227 kilograms—of marijuana per month for distribution. (Trial Tr. 1680:02–05, ECF No. 276, PageID 3415.)

Malik Curry also testified that he bought one to ten pounds of marijuana from Teddy Asefa "[s]ometimes weekly" and "[s]ometimes monthly" from 2015 through 2021. (Trial Tr. 773:02–774:04, ECF No. 273, PageID 2508–09.) He identified Mr. Abate, Teddy Asefa, Menelik Solomon, and Mr. Savage as members of the Third World Mob and explained that the Third World Mob was a group of individuals who worked together to traffic narcotics. (*Id.* 769:11–772:19, 781:07–782:25, PageID 2504–07, 2516–17.)

Mr. Curry also testified about an incident involving Mr. Savage. After Yiarad Tesfai—an unindicted alleged member of the Third World Mob—was murdered, two drug addicts were found with his cell phone. (Trial Tr. 791:09–795:18, 810:01–812:24, ECF No. 273, PageID 2527–30, 2545–47.) Amanial Andemariam, also known as "Greedy," was trying to determine whether the cell phone could explain Mr. Tesfai's death. (*Id.*) He recruited Mr. Curry and Mr. Savage to evaluate whether the drug addicts, who claimed they did not find the cell phone on Mr. Tesfai's body, were telling the truth. (*Id.*) Mr. Savage and Mr. Andemariam both had firearms. (*Id.*) Mr.

8

Andemariam retrieved the phone that purportedly belonged to Mr. Tesfai from one of the drug addicts, and then pistol whipped them. (*Id.*)

By the Government's calculation, "Malik Curry got at least twenty pounds of marijuana per month from the Third World Mob for 7 years, for a total of 1,680 pounds"—or 762 kilograms. (Opp., PageID 3661.) When added with the amounts from the searches and seizures, the Government reasons it put forth evidence that Third World Mob trafficked at least 2,000 kilograms over the course of the conspiracy. (*Id.*)

### III.     Mr. Savage's Defense at Trial

Mr. Savage's defense at trial focused on the fact that he was incarcerated, housed at a halfway house, or tracked through global position system ("GPS") monitoring by the Ohio Adult Parole Authority for most of the alleged conspiracy. (Mot., PageID 3640–42.) Since he was incarcerated for most of the conspiracy, Mr. Savage argued that he could not have been responsible for over 1,000 kilograms of marijuana allegedly distributed by his co-conspirators. (*Id.*) He explained that he was incarcerated, in a halfway house, or subject to GPS monitoring, during the following time periods:

- May 22, 2008 – October 26, 2020:          Incarcerated
- September 13, 2021 – September 20, 2021:  Incarcerated
- September 20, 2021 – December 15, 2021:   GPS Monitoring
- December 15, 2021 – December 29, 2021:    Incarcerated
- December 29, 2021 – February 23, 2022:    Alvis Halfway House
- August 4, 2022 – present:                 Incarcerated

(*Id.* PageID 3641; *see also* ECF No. 217.) Of the total 3,359 days of the conspiracy, the parties agreed that Mr. Savage spent all but 484 days incarcerated or otherwise monitored. (*Id.*)

At the conclusion of the Government's case, Mr. Savage and his co-defendants moved for a judgment of acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure. (Trial Tr. 1704:08–15, ECF No. 276, PageID 3439.) Defendants argued that there was insufficient evidence

to support a conviction. (*Id*. 1711:04–17:13:21, PageID 3446–48.) The Court denied those motions and the case proceeded to the jury for deliberations. (*Id*. 1713:13–21, PageID 3448 (denying motion for judgment of acquittal as to all defendants on Count 1).)

## IV.    Jury Deliberations and Verdict

As it relates to Mr. Savage, the jury was first tasked with determining whether Mr. Savage was guilty of engaging in a conspiracy to distribute marijuana under Count 1. (Jury Verdict, ECF No. 248, PageID 1545.) If the jury concluded unanimously that he was guilty of the conspiracy, then the jury had to determine the amount of marijuana attributable to Mr. Savage because of his own conduct or the reasonably foreseeable conduct of his co-conspirators. (*Id.* PageID 1546.) The four options as to the quantity of marijuana were: (1) 1,000 kilograms or more; (2) 100 kilograms or more, but less than 1,000 kilograms; (3) 50 kilograms or more, but less than 100 kilograms; or (4) less than 50 kilograms. (*Id.*)

During its deliberations, the jury submitted several questions to the Court, two of which are relevant to Mr. Savage. First, the jury asked: "If determined that an individual is part of a conspiracy, is he charged with the amount of drugs found within the group even if he was incarcerated?" (Trial Tr. 1863:10–18, ECF No. 277, PageID 3598.) To assist the jury, the Court referred the jury to Instruction 19, which instructed the jury how to determine the amount of marijuana attributable to a defendant. (*See* ECF No. 245, PageID 1473–74.) As the Court explained, a defendant is responsible for the amount of marijuana that stemmed from his conduct and the conduct of his co-conspirators that was reasonably foreseeable to him. (*Id.*)

The jury next asked: "If I am part of a conspiracy, at what point does my role in the conspiracy end? What can constitute leaving a conspiracy? And, for example, if I contributed to a conspiracy 10 years ago and left, would I be responsible for everything my co-conspirators did after leaving?" (Trial Tr. 1880:15–21, ECF No. 278, PageID 3615.) Without objection, the Court

10

referred the jury to Instruction 18, which defined the elements of a conspiracy to distribute controlled substances. *(Id.* 1890:10–20, PageID 3625; ECF No. 245, PageID 1470–72.)

Soon after, the jury returned its verdict. The jury found Mr. Savage and Mr. Abate guilty on all counts, but acquitted Thomas Asefa of the obstruction of justice charge. (ECF No. 248.) The jury found Mr. Savage and Mr. Abate responsible for 1,000 kilograms or more of marijuana. (*Id.*)

## STANDARD OF REVIEW

"A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict" and a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a), (c). In assessing a defendant's challenge to the sufficiency of the evidence under Rule 29, the Court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "Reversal of a conviction is warranted 'only if, viewing the record as a whole, the judgment is not supported by substantial and competent evidence.'" *United States v. Smith*, 749 F.3d 465, 477 (6th Cir. 2014) (quoting *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir. 1991)).

In considering a Rule 29 motion, a court must not "weigh the evidence, assess the credibility of witnesses, or substitute its judgment for that of the jury." *United States v. Wright*, 16 F.3d 1429, 1440 (6th Cir. 1994), *cert. denied*, 512 U.S. 1243 (1994). The defendant "bears a very heavy burden" of making his showing. *United States v. Ross*, 502 F.3d 521, 529 (6th Cir. 2007) (citing *United States v. Davis*, 397 F.3d 340, 344 (6th Cir. 2005)); *see also United States v. Wheat*, 988 F.3d 299, 306 (6th Cir. 2021) (describing the burden as "demanding").

When a defendant moves under Federal Rule of Criminal Procedure 33(a), "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P.

33(a). Rule 33 motions are granted only if the verdict is against "the manifest weight of the evidence." *United States v. Mallory*, 902 F.3d 584, 596 (6th Cir. 2018). "Unlike on a Rule 29 motion, which requires that the court view the evidence in the light most favorable to the government, in assessing the manifest weight of the evidence for Rule 33 purposes, 'the trial judge ... take[s] on the role of a thirteenth juror, weighing evidence and making credibility determinations firsthand to ensure there is not a miscarriage of justice.'" *United States v. Carter*, No. 1:20-cr-62, 2022 U.S. Dist. LEXIS 127464, at *5 (S.D. Ohio July 18, 2022) (Cole, J.) (quoting *Mallory*, 902 F.3d at 596). "Generally, such motions are granted only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict.'" *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (internal quotation omitted), *aff'd*, 633 F.2d 219 (6th Cir. 1980)).

## ANALYSIS

Mr. Savage moves the Court to acquit him under Rule 29, or, in the alternative, to grant him a new trial under Rule 33. (Mot., PageID 3638.) The Court first considers whether Mr. Savage is entitled to a judgment of acquittal, before turning to his alternative request for a new trial.

### I.    Motion for Judgment of Acquittal

The standard Mr. Savage must satisfy to prevail on his motion is a "demanding" one: He must show that "no rational jury could have found the essential elements of a conspiracy beyond a reasonable doubt." *Wheat*, 988 F.3d at 306. A conviction under 21 U.S.C. § 846 for conspiracy to distribute controlled substances requires proof of three elements: "(1) an agreement by two or more persons to violate the drug laws, (2) knowledge and intent to join in the conspiracy, and (3) participation in the conspiracy." *United States v. Paige*, 470 F.3d 603, 608 (6th Cir. 2006); *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (citation omitted).

To maintain a conviction, the Government must show the co-conspirators knowingly reached an agreement to distribute drugs. *Wheat*, 988 F.3d at 304. As the Court instructed the jury

12

at trial, that agreement need not be a formal agreement, either written or spoken. (ECF No. 245, PageID 1470–71); *see also United States v. Gibbs*, 182 F.3d 408, *9 (6th Cir. 1999) (explaining that an agreement "need not be express to form a conspiracy"). Proof of a criminal agreement also does not require proof that every co-conspirator agreed on all the details—"a mere tacit understanding among participants is sufficient[.]" *United States v. Harrison*, 663 F. App'x 460, 464 (6th Cir. 2016) (citation omitted). Nor is a particular organizational structure or level of sophistication necessary to show a conspiracy to traffic narcotics. *Gibbs*, 182 F.3d at *10.

A single transaction between a buyer and a seller is not, however "sufficient to establish the existence of a conspiracy." *United States v. Shoulders*, No. 23-5123, 2024 U.S. App. LEXIS 20515, at *10 (6th Cir. Aug. 12, 2024). If conspiracy could be shown by mere sales, that "would render the conspiracy an essentially limitless enterprise." *United States v. Swafford*, 512 F.3d 833, 842, n.3 (6th Cir. 2008); *see also United States v. Deitz*, 577 F.3d 672, 680 (6th Cir. 2009) (explaining that mere sales do not prove the agreement that is essential for a conspiracy).

When deciding whether the Government proved the existence of a criminal agreement, or a conspiracy, the jury can consider testimony of co-conspirators, *United States v. Copeland*, 321 F.3d 582, 600 (6th Cir. 2003), as well as "repeated purchases, or evidence of a large quantity of drugs." *United States v. Caver*, 470 F.3d 220, 233 (6th Cir. 2006); *see also Wheat*, 988 F.3d at 308 (holding that evidence of purchases of large amounts of drugs "allow[s] a jury to conclude that the buyer and seller have reached a tacit agreement for the buyer to resell the drugs to downstream customers"). "And the Government may fulfill its burden of proof by circumstantial evidence." *United States v. Tate*, No. 24-5687, 2025 U.S. App. LEXIS 7723, at *6 (6th Cir. Mar. 31, 2025) (citation omitted).

"Once a conspiracy is shown beyond a reasonable doubt, a defendant's connection to the conspiracy need only be slight, and the government is only required to prove that the defendant

was a party to the general conspiratorial agreement." *Dietz*, 577 F.3d at 677 (citation omitted); *United States v. Shabani*, 513 U.S. 10, 13 (1994) (explaining that § 846 does not require an overt act). That said, "mere association with conspirators is not enough to establish participation in a conspiracy." *United States v. Pearce*, 912 F.2d 159, 162 (6th Cir. 1990) (citation omitted). A defendant must have knowledge of the conspiracy's objectives and voluntarily associate himself with it to further those objectives. *United States v. Williams*, 998 F.3d 716, 729 (6th Cir. 2021). Knowledge can be inferred through circumstantial evidence. *Caver*, 470 F.3d at 233 (6th Cir. 2006). But the defendant need not know everything about, or everyone involved in, the conspiracy, or have been a member from the beginning. *United States v. Stephens*, 492 F.2d 1367, 1373 (6th Cir. 1974) ("It is not necessary that each member of the conspiracy be a member of it from the beginning so long as each joins it while it is still in operation.").

The Government presented enough evidence for a rational trier of fact to find that the Third World Mob was engaged in a conspiracy to illegally distribute marijuana and that Mr. Savage knew of the conspiracy and consciously participated in its objectives.

### A. Mr. Savage's co-conspirators testified to the existence of the conspiracy and Mr. Savage's membership in the Third World Mob.

The Government offered testimony of co-conspirators Malik Curry and Brandon Moore who corroborated the existence of the Third World Mob. Both witnesses testified that they repeatedly purchased marijuana from members of the Third World Mob to sell downstream to customers. Mr. Curry testified that he was a member of the Third World Mob and purchased several pounds of marijuana from Teddy Asefa weekly or monthly from 2015 to 2021. (Trial Tr. 773:02–774:04, 781:07–23, ECF No. 273, PageID 2508–09, 2516–17.) He identified Mr. Abate, Teddy Asefa, Menelik Solomon, and Mr. Savage as members of the Third World Mob and

explained that the Third World Mob was a group of individuals who worked together to traffic narcotics. (*Id.* 769:11–772:19, 781:07–782:25, PageID 2504–07, 2516–17.)

Mr. Curry also testified about an incident involving Mr. Savage. After Yiarad Tesfai—an unindicted alleged member of the Third World Mob—was murdered, two drug addicts were found with his cell phone. (Trial Tr. 791:09–795:18, 810:01–812:24, ECF No. 273, PageID 2527–30, 2545–47.) Amanial Andemariam, also known as "Greedy," was trying to determine whether the cell phone could explain Mr. Tesfai's death. (*Id.*) He recruited Mr. Curry to evaluate whether the drug addicts, who claimed they did not find the cell phone on Mr. Tesfai's body, were telling the truth. (*Id.*) When Mr. Curry arrived, Mr. Savage was there with Mr. Andemariam. (*Id.*) Mr. Savage and Mr. Andemariam both had firearms. (*Id.*) Mr. Andemariam retrieved the phone that purportedly belonged to Mr. Tesfai from one of the drug addicts, and then pistol whipped them. (*Id.*) According to the Government, this was evidence that Mr. Savage assisted in an act of violence related to the drug trafficking conspiracy. (Opp., PageID 3667.)

Mr. Moore testified that after he was caught with 11 kilograms of marijuana in a traffic stop, he again received marijuana from individuals associated with the Third World Mob. (Trial Tr. 431:03–432:23, ECF No. 272, PageID 2166–67.) Similarly, Nebiyu Wassihun testified that the Third World Mob was getting about 500 pounds of marijuana per month for distribution. (Trial Tr. 1680:02–05, ECF No. 276, PageID 3415.) Mr. Wassihun identified Mr. Abate, Teddy Asefa, Fentahun Mengistu, and Amanial Andemariam as members of the Third World Mob and admitted that he dealt drugs with and for them. (Trial Tr. 953:02–954:13, ECF No. 274, PageID 2688–89.)

Mr. Curry's testimony connected Mr. Savage with Mr. Abate and Teddy Asefa. Mr. Curry admitted that he and Mr. Savage were members of the Third World Mob. He explained that Mr. Savage brought a firearm and participated in an act of violence in furtherance of the drug trafficking conspiracy. The repeat purchases testified to by alleged co-conspirators Mr. Moore and

Mr. Curry, the volume of marijuana testified to by Mr. Wassihun, and the amount of marijuana seized from various searches as described herein, collectively amounted to substantial and competent evidence that a conspiracy to traffic narcotics existed.[2] *See Caver*, 470 F.3d at 233.

### B. The Government connected Mr. Savage to three locations where evidence of drug trafficking was found.

The Government introduced evidence connecting Mr. Savage to at least three locations where marijuana or its cash-equivalent was seized by law enforcement during the conspiracy. First, while conducting surveillance at Acarie, Sergeant Smith saw Mr. Savage open the door for Brandon Moore who purchased 11 kilograms later seized by law enforcement. (Trial Tr. 1282:03–1291:03, ECF No. 275, PageID 3016–26.)

Mr. Savage argues that Mr. Moore's testimony identifying him as the person who opened the door lacks credibility. (Mot., PageID 3648.) Mr. Moore testified that the person who answered the door was "shorter than [Mr.] Savage, with no glasses and no facial hair, though [Mr.] Savage always wore facial hair and glasses." (*Id.*; *see also* Trial Tr. 472–79, ECF No. 272, PageID 2207–14.) But the credibility of Mr. Moore's testimony was squarely before the jury. During cross-examination, defense counsel questioned Mr. Moore about his incentive to testify in exchange for a reduction in his sentence. The Court instructed the jury to consider the motive of cooperating witnesses in the final jury instructions. (ECF No. 245, PageID 1457–58.) Once advised to consider the motivation of witnesses, the ultimate credibility determination is left to the jury—not the Court.

---

[2] During trial, the Court made a finding that the Government had met its burden to admit the statements of the co-conspirators under Rule 801(d)(2)(E) of the Federal Rules of Evidence, by proving by a preponderance of the evidence the existence of a conspiracy. (Trial Tr. 1427:05–1429:20, ECF No. 275, PageID 3162–64.) Although the standard of proof to admit statements of co-conspirators is different than the burden required on a motion for judgment of acquittal, the Court explained that Mr. Curry and Mr. Moore's testimony identifying members of the conspiracy and admitting to dealing drugs on behalf of the Third World Mob supported this finding. (*Id.*) The Court's reasoning during trial on the record supports its conclusion here as well.

*See United States v. Howard*, 621 F.3d 433, 460 (6th Cir. 2010) (quotation omitted). A rationale trier of fact could have found Mr. Moore's testimony credible.

Even if the jury disregarded Mr. Moore's identification of Mr. Savage, two other witnesses connected him to the Acarie townhouse. Sergeant Smith testified that he witnessed Mr. Savage open the door for Mr. Moore (Trial Tr. 1282:03–1291:03, ECF No. 275, PageID 3016–26), and Teddy Asefa's girlfriend, Ciere Robinson, testified that she saw Mr. Savage at the townhouse on multiple occasions (Trial Tr. 1107:10–13, 1110:10–13, ECF No. 274, PageID 2842, 45).

Next, the Government introduced evidence of a Delta airlines' luggage receipt with Mr. Savage's name listed as the passenger found at the Chambers Road address, where three kilograms of marijuana, a firearm, and drug packaging materials were seized. (Trial Tr. 585:08–10, ECF No. 272, PageID 2320 (Officer Mason's testimony).) The Government put forth evidence that one of the Third World Mob's suppliers of marijuana was in Atlanta, Georgia, and that members of the Third World Mob would travel there to obtain marijuana. Mr. Savage's luggage receipt was circumstantial evidence that he traveled to Atlanta during the conspiracy.

Surveillance photos and the GPS data from Mr. Savage's ankle monitor[3] placed him at Royal Crescent one day before law enforcement seized 45 pounds (or 20 kilograms) of marijuana, firearms, and ammunition from the address. (Trial Tr. 1305:09–1306:21, ECF No. 275, PageID 3040–41 (testifying to the surveillance photos); *id.* PageID 3043–46 (Sergeant Smith testifying about the GPS data from Mr. Savage's ankle monitor); *see also* Trial Tr., 532:01–560:16, ECF

---

[3] Mr. Savage argues that the data from his ankle monitor suggests that he remained on the first floor of the Royal Crescent address, while the marijuana recovered the next day was found upstairs in the master bedroom closet. (Mot., PageID 3648 (citing Trial Tr. 1549:15–1560, ECF No. 276).) But he offers no data or testimony to substantiate his argument. Plus, a reasonable juror could determine that given the weight of the other evidence against him, such a fact was not of import.

No. 272, PageID 2267–95 (Detective Sontino Williams's testimony about the search and seizure at Royal Crescent on November 9, 2021).)

To sum, the Government directly connected Mr. Savage to three locations (Acarie, Chambers, and Royal Crescent) where marijuana was seized. He was seen at Royal Crescent within one day of law enforcement seizing a large volume of marijuana from that address. In total, the searches of these addresses yielded 34 kilograms of marijuana (11 kilograms (Acarie) + 3 kilograms (Chambers) + 20 kilograms (Royal Crescent) = 34 kilograms). Further, when Mr. Savage was subject to traffic stop in August 2022, the police officers smelled and saw marijuana, and then found a firearm, a large amount of cash, five cellphones, and ski masks in the vehicle. (Trial Tr. 1190:21–1206:25, ECF No. 275, PageID 2925–41 (Officer Chris Davis's testimony).) His connection to three locations linked to the conspiracy, where marijuana, firearms, and drug packaging materials were found, along with the fact that he himself was found with evidence of drug trafficking, is sufficient for a rational jury to find that he was knowing participant in the conspiracy.

### C. The Government put forth evidence that Mr. Savage represented his membership in the Third World Mob on social media.

Although circumstantial, the Government introduced evidence that Mr. Savage wore a pendant exclusively worn by members of the conspiracy and posted on social media about his membership in the Third World Mob. This evidence, along with the testimony of his co-conspirators and his connection to locations where large amounts of marijuana was found, further supports a finding that Mr. Savage participated in the conspiracy.

Malik Curry testified that he saw Mr. Savage at an apartment near the Royal Crescent address wearing a large Third World Mob pendant. (Trial Tr. 785:17–786:24, ECF No. 273, PageID 2520–21 (describing a necklace with a symbol of Africa made with diamonds and gold

18

that said "3WM" and "drug gang").) According to Mr. Curry, only members of the Third World Mob could wear the pendant. (*Id.*)

Sergeant Smith testified that during the investigation, law enforcement obtained records from Mr. Savage's Instagram and Facebook accounts. (Trial Tr. 1442:09–1465:08, ECF No. 276, PageID 3177–3200.) Those records showed that Mr. Savage posted that he was in an "exclusive family" and that "the lil trust I got is fr 3wm." (*Id.* 1444:08–09, PageID 3179.) "3wm" or "3WM" is understood to be short for the Third World Mob. He shared an Instagram story stating "3WM. Bitch, I'm everywhere[.]" (*Id.* 1445:22, PageID 3180.) He directed another post to Mr. Abate, who was known as "Sosa" saying, "happy birthday to my top dog, brother, family member, and captain of da Third screaming we all love you, Sosa." (*Id.* 1448:15–118, PageID 3183.) Another post included "Da" next to the number 3 with the world emoji and then the "M" emoji. (*Id.* 1451:12–14, PageID 3186.) He also posted "Allah first. Then 3WM." (*Id.* 1453:04, PageID 3188.) Several of his posts included pictures of him wearing the Third World Mob pendant or gesturing the Third World Mob hand sign. (*Id.* 1459:16–1463:04, PageID 3194–98.)

In one conversation on social media, Sergeant Smith testified that Mr. Savage attempted to sell approximately one pound—less than half a kilogram—of marijuana. (*Id.* 1455:20–1556:10, PageID 3190–91.) The Government did not present evidence that the sale was ever completed and the identity of the person Mr. Savage was communicating with remains unknown. (*Id.* 1660:06–1661:15, PageID 3395–96.)

The Government also introduced evidence of a video posted on social media by someone named "Ant," who according to Sergeant Smith was a member of the Third World Mob. (*Id.* 1463:13–1465:08, PageID 3198–3200.) The video showed Mr. Savage dancing to music, shirtless, and wearing red shorts. (*Id.*) Large amounts of marijuana and cash were visible in the background of the video. (*Id.*)

19

When taken together, this evidence shows more than a mere association between Mr. Savage and members of the conspiracy. Mr. Savage's representations whether on social media, by wearing the Third World Mob pendant, or displaying hand signals, suggested that he was at least aware of the conspiracy's objective to illegally traffic marijuana and chose to voluntarily associate himself. *Williams*, 998 F.3d at 729.

### D. The jury had sufficient evidence to attribute 1,000 kilograms or more of marijuana to Mr. Savage.

After determining that Mr. Savage was guilty of participating in the conspiracy, the jury had to determine the amount of marijuana attributable to him. The jury was required to make this finding because the U.S. Supreme Court demands that any contested fact that would increase the statutory minimum or maximum penalties for an offense be submitted to a jury and proven beyond a reasonable doubt. *See Apprendi v. New Jersey*, 530 U.S. 466, 492 (2000). Here, because the amount of marijuana involved in the conspiracy would increase Mr. Savage's mandatory minimum, the jury was required to unanimously agree on a minimum quantity of marijuana attributable to Mr. Savage. (ECF No. 245, PageID 1473–74.)

The jury unanimously agreed that 1,000 kilograms or more of marijuana was attributable to Mr. Savage. (ECF No. 248, PageID 1545–46.) Mr. Savage argues that the jury did not have sufficient evidence to reach that conclusion. (*See* Mot.)

### i. A rational trier of fact could find Mr. Savage responsible for the total amount of marijuana attributable to the conspiracy.

In a drug conspiracy, a defendant may be held liable for the quantities of drugs attributable to him, or to other members of the conspiracy, if those quantities were known or reasonably foreseeable to the defendant. *United States v. Rosales*, 990 F.3d 989, 997–98 (6th Cir. 2021). For example, the Sixth Circuit in *Rosales* affirmed a jury verdict holding the defendant responsible for the full quantity of drugs in the conspiracy, because the quantity of drugs was foreseeable to the

defendant. *Id.* The Sixth Circuit derives this defendant-specific approach from the sentencing guidelines, which provide that a defendant is subject to sentencing liability based on his own conduct and the conduct of his co-conspirators only to the extent that the co-conspirators conduct was reasonably foreseeable to him. *United States v. Swiney*, 203 F.3d 397, 406 (6th Cir. 2000) (citing U.S.S.G. § 1B1.3(a)(1)(B)).

But a defendant's criminal liability for a conspiracy is broader than a defendant's sentencing liability for the acts of others.[4] U.S.S.G. § 1B1.3, cmt. n.1 (distinguishing sentencing accountability from criminal liability with respect to the acts of others). A defendant "may join a conspiracy already in progress and be held responsible for actions done in furtherance of the conspiracy *before he joined it*." *United States v. Robinson*, 390 F.3d 853, 882 (6th Cir. 2004) (emphasis added); *United States v. Cimini*, 427 F.2d 129, 130 (6th Cir. 1970) ("where a conspiracy is already in progress, a late comer who knowingly joins it takes it as he finds it and he may be held responsible for acts committed in furtherance of the conspiracy before he joined it"); *see also United States v. Gowder*, 841 F. App'x 770, 781 (6th Cir. 2020) ("And even though [defendant] did not join the conspiracy until [after the pill mill had] opened, it has long been established that a conspirator may join a conspiracy already in progress and be held responsible for actions done in furtherance of the conspiracy before he joined.").

---

[4] In contrast, a defendant may only be sentenced based on the specific activity that he or she agreed to jointly undertake. U.S.S.G. § 1B1.3; *see also United States v. Bailey*, 973 F.3d 548, 575 (6th Cir. 2020) ("the defendant can only be held accountable for the criminal activity that the particular defendant agreed to jointly undertake"). At sentencing the scope of the conspiracy generally does not extend to conduct of members of the conspiracy before the defendant joined the conspiracy, even if the defendant knows of that conduct. *United States v. Evans*, 90 F.4th 257, 263 (4th Cir. 2024); *see also United States v. Presendieu*, 880 F.3d 1228, 1246 (11th Cir. 2018) ("mere awareness" that a defendant was part of a larger scheme "is alone insufficient to show that [the co-conspirator's] criminal activity was within the scope of [the defendant's] jointly undertaken criminal activity.").

The Sixth Circuit's reasoning in *United States v. Collins* is illustrative. In that case, the defendant was accused of participating in a conspiracy to distribute methamphetamine from January 2009 to April 2011, but he was incarcerated from November 2008 to January 2010 on unrelated charges. 799 F.3d 554, 579 (6th Cir. 2015). He argued that evidence before he was released in January 2010 should be excluded. *Id.*

The Sixth Circuit disagreed and found the evidence that his co-conspirators purchased drugs before he was released was admissible to establish the "existence and nature of the conspiracy even absent evidence that [he] joined the conspiracy before [his] respective release[] from incarceration." *Id.* Moreover, witness testimony that placed the defendant—after he was released—at several places where members of the conspiracy cooked methamphetamine could sustain the jury's finding that he conspired to distribute 500 grams or more of methamphetamine. *Id.* at 590. Under the "very heavy burden on defendants" when moving for a judgment of acquittal, defendants "failed to demonstrate that it would be impossible 'for *any* rational trier of fact' to find that [they] conspired to manufacture and distribute 500 grams or more of methamphetamine." *Id.* at 590 (emphasis in original and citations omitted).

Mr. Savage equally fails to demonstrate that it would be impossible for any rational trier of fact to attribute 1,000 kilograms or more of marijuana to him based on his or his co-conspirators reasonably foreseeable conduct. Mr. Savage's Motion, like his defense at trial, focuses on the fact that he was incarcerated for most of the alleged conspiracy, and therefore the quantity of marijuana attributable to the conspiracy before he was released from prison was not reasonably foreseeable to him. (Mot., PageID 3644–45.) The parties agree that Mr. Savage was incarcerated for twelve-years, from May 2008 until October 2020. (ECF No. 217.) The Government did not introduce any evidence that he had a relationship with any of his co-conspirators before he went to prison in 2008. (*Id.*) Nor does the Government argue that Mr. Savage ever communicated with, was visited

by, or was given money by any of the alleged co-conspirators during his prison sentence. (Trial Tr. 1544:012–1545:17, ECF No. 276, PageID 3279–80 (Sergeant Smith testimony).)

Two events related to the conspiracy occurred while Mr. Savage was serving his twelve-year prison sentence. First, the police seized 95 pounds of marijuana and $80,000 in cash from a hotel room in Tucson, Arizona in 2013. (Trial Tr. 215:08–222:25, ECF No. 271, PageID 1950–58 (Detective Cheek testimony).) The Government attributes 61 kilograms of marijuana to the conspiracy from that search. (*Id.*) Next, in 2019, law enforcement seized $940,000 in cash from Mr. Abate's residence at 1357 Phlox Avenue. (Trial Tr. 275:12–22, ECF No. 271, PageID 2010.) Together, these events yielded 274 kilograms of marijuana attributable to the conspiracy. Mr. Savage argues that there was insufficient evidence connecting him to these two events, and without the 274 kilograms of marijuana, no rational trier of fact could attribute more than 1,000 kilograms of marijuana to him. (Mot., PageID 3645.)

Not so. As the case law above explains, a defendant who joins a conspiracy already in progress "takes it as he finds it" *Cimini*, 427 F.2d at 130, and may be held responsible for actions done in furtherance of the conspiracy before he joined it. *Robinson*, 390 F.3d at 882; *see also Gowder*, 841 F. App'x at 781. Therefore, a rational trier of fact *could have* attributed the 274 kilograms of marijuana seized in Tucson in 2013 and from Phlox Avenue in 2019, to Mr. Savage.

The Government put forth evidence that Mr. Savage was involved in the Third World Mob's drug trafficking organization for about 18 months from his release in October 2020 to his arrest on August 4, 2022. As explained above, he was connected to three addresses where 34 kilograms of marijuana were seized—Acarie (11 kilograms), Chambers (3 kilograms), and Royal Crescent (20 kilograms). That conduct brings the total kilograms of marijuana attributable to Mr. Savage to 308 kilograms.

Mr. Savage's arrest in August 2022 does not absolve him of liability for marijuana seized thereafter. *See Robinson*, 390 F.3d at 882 (explaining that an arrest does not end a co-conspirator's participation in the conspiracy). Given his activity while he was released from prison, it was reasonably foreseeable to Mr. Savage that his co-conspirators would continue to traffic large amounts of marijuana after his arrest. His incarceration when the Government searched the Chapel Stone address does not prevent the jury from attributing the 700 kilograms of marijuana found during that search to Mr. Savage.

Thus, when viewing the evidence in a light most favorable to the prosecution, the Government put forth sufficient evidence to attribute over 1,000 kilograms of marijuana to Mr. Savage—11 kilograms (Acarie) + 3 kilograms (Chambers) + 20 kilograms (Royal Crescent) + 61 kilograms (Tucson) + 213 kilograms (Phlox) + 700 kilograms (Chapel Stone) = 1,008 kilograms.

### ii. Even without marijuana seized before 2020, a rational trier of fact could attribute 1,000 kilograms of marijuana to Mr. Savage.

Even if the jury did not attribute the 274 kilograms of marijuana attributable to the conspiracy before Mr. Savage was released from prison in 2020, a rational trier of fact could still conclude that Mr. Savage was responsible for 1,000 kilograms or more of marijuana. To do so, the jury need only find that it was reasonably foreseeable to Mr. Savage that members of the Third World Mob were trafficking 1,000 kilograms or more of marijuana. Testimony from Malik Curry and Nebiyu Wassihun would allow a reasonable jury to infer that Mr. Savage knew that his co-conspirators were trafficking 1,000 kilograms or more of marijuana. *Dietz*, 577 F.3d at 681 (holding that a reasonable jury could infer the threshold drug quantity from witnesses' testimony).

Malik Curry testified that he and Mr. Savage were members of the Third World Mob, and that he was selling for the Third World Mob between one and ten pounds of marijuana weekly, or monthly, from 2015 through 2021. (Trial Tr. 773:02–774:04, ECF No. 273, PageID 2508–09.) By

the Government's calculation, that amounts to 762 kilograms attributable to the Third World Mob from Malik Curry alone. (Opp., PageID 3661.)

Nebiyu Wassihun also testified that starting in 2018, he purchased marijuana from members of the Third World Mob. (Trial Tr. 957:05–16, ECF No. 274, PageID 2692.) And that during the conspiracy, the Third World Mob received about 500 pounds—or 226 kilograms—of marijuana at a time for distribution. (Trial Tr. 1680:02–05, ECF No. 276, PageID 3415.) Mr. Wassihun and Mr. Curry's testimony together could account for over 1,000 kilograms of marijuana attributable to the conspiracy and reasonably foreseeable to Mr. Savage.

The jury also could have added these amounts, in full or in part, to the 34 kilograms of marijuana seized from locations that the Government connected to Mr. Savage, and 274 kilograms from Tucson and Phlox, to reach over 1,000 kilograms. Or the jury could have found Mr. Curry's testimony credible, but not Mr. Wassihun's, and added the 762 kilograms Mr. Curry attributed to the conspiracy, with the 34 kilograms of marijuana seized from Acarie, Chambers, and Royal Crescent, to the 700 kilograms seized from Chapel Stone. That calculation would bring the total amount of marijuana attributable to Mr. Savage based on the reasonably foreseeable conduct of his co-conspirators to 1,496 kilograms. It is not the place of this Court to substitute its credibility assessment of these witnesses for that of the jury. *Collins*, 799 F.3d at 590.

### iii.     Mr. Savage's arguments to the contrary are unpersuasive.

Mr. Savage counters first that after he was released from prison in 2020, he spent more time either on GPS-monitoring, living at a halfway house, or once again incarcerated. (ECF No. 217.) He was incarcerated for a week in September 2021. (*Id.*) Immediately thereafter, until December 15, 2021, Mr. Savage was wearing an ankle monitor and subject to GPS monitoring. (*Id.*) On December 15, 2021, he was incarcerated again until December 29, 2021, when he was released and moved to the Alvis Halfway House until February 23, 2022. (*Id.*) He was arrested in

connection with this case on August 4, 2022, and has been incarcerated since. (*Id.*) In sum, for all but 484 days of the 3,359 days of the alleged conspiracy, Mr. Savage was incarcerated, subject to GPS monitoring, or living at a halfway house.

But the fact that he was subject to GPS location monitoring, or living at the Alvis Halfway House, does not exonerate him of his involvement in the conspiracy or the amounts of marijuana attributable to the conspiracy during those times. He could still traffic marijuana and participate in the conspiracy while subject to GPS monitoring or living at the Alvis Halfway House, as the Government suggests. At the very least, the conduct of his co-conspirators remained reasonably foreseeable to him while he was subject to location monitoring or living at Alvis.

Mr. Savage next argues that "the jury was persuaded by the Government that [his] physical mere presence (or even a baggage ticket's mere presence) at locations after his release from prison" in October 2020 "made him guilty by association." (Mot., PageID 3649.) He explains that he had no connection to the marijuana attributed to the conspiracy from Menelik Solomon's traffic stop, and that he was incarcerated when 700 kilograms of marijuana was seized from Chapel Stone. (*Id.* PageID 3647–49.)

But more than his "mere presence" connected Mr. Savage to the conspiracy. Mr. Savage himself was found with a firearm, five cellphones, and a large amount of cash. He was placed by Sergeant Smith and Brandon Moore at a drug deal at Acarie. He was seen carrying a gun in furtherance of the conspiracy with Amanial Andemariam. He tried to sell marijuana on social media, was seen in a social media video with large amounts of marijuana and represented on his accounts that he was a member of the Third World Mob. A rational trier of fact could attribute 1,000 kilograms of marijuana to Mr. Savage.

The Government introduced legally sufficient evidence that Mr. Savage knew that the Third World Mob was illegally distributing marijuana and chose to associate himself with that

objective. Sufficient evidence also supported the jury's verdict that the conduct of his co-conspirators was reasonably foreseeable to him and that the conspiracy involved a minimum of 1,000 kilograms of marijuana. The Motion for Judgment of Acquittal is **DENIED**.

## II. Motion for New Trial

In the alternative to a judgment of acquittal under Rule 29, Mr. Savage asks that the Court order a new trial under Rule 33 of the Federal Rules of Criminal Procedure. (Mot., PageID 3649.) That Rule permits the Court to vacate a judgment and order a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). Generally, motions under this rule are granted only in the extraordinary circumstance where the verdict is against "the manifest weight of the evidence," *Mallory*, 902 F.3d at 596, or "where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010).

The Motion asserts that the evidence introduced by the Government at trial was insufficient for the jury to reach its verdict, but does not develop arguments about how the jury verdict was against the weight of the evidence or that the Court committed a substantial legal error. Even if it did, much of the same reasoning as articulated above would apply. The Court is not persuaded that the interests of justice require a new trial. Mr. Savage was represented by extremely competent legal counsel at trial, who thoroughly cross-examined the witnesses put forth by the Government. Mr. Savage has not met his burden to show the Court failed to provide him with a fair trial, and his motion for a new trial is **DENIED**.

## CONCLUSION

For the reasons above, Mr. Savage's Motion for a Judgment of Acquittal is **DENIED** as is his request for a new trial. (ECF No. 279.)

**IT IS SO ORDERED.**

**5/20/2025**                                         **s/Edmund A. Sargus, Jr.**
**DATE**                                                **EDMUND A. SARGUS, JR.**
                                                            **UNITED STATES DISTRICT JUDGE**